19 F.3d 431
 28 Fed.R.Serv.3d 514
 JOHNSON INTERNATIONAL COMPANY, a Washington Corporation,
Plaintiff-Appellee,
v.
JACKSON NATIONAL LIFE INSURANCE COMPANY, a Michigan
Corporation, Defendant-Appellant.
JOHNSON INTERNATIONAL COMPANY, a Washington Corporation,
Plaintiff-Appellant,
Cassem, Tierney, Adams, Gotch & Douglas, Attorneys for
Johnson International Company, Sanctioned Under
Fed.R.Civ.P. 36(a) and 37(c) by Court
Memorandum and Order Dated
January 27, 1993, Appellant,
v.
JACKSON NATIONAL LIFE INSURANCE COMPANY, a Michigan
Corporation, Defendant-Appellee.
 Nos. 93-1556, 93-1598.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 8, 1993.
Decided March 25, 1994.
 
 David M. Woodke, Omaha, NE, argued (Susan E. Norris, on the brief), for appellant.
 Daniel J. Duffy, Omaha, NE, argued, for appellee.
 Before BEAM, Circuit Judge, LAY, Senior Circuit Judge, and BOGUE,* Senior District Judge.
 LAY, Senior Circuit Judge.
 
 
 1
 This is a diversity action brought by Johnson International Company ("Johnson International"), a Washington corporation, against Jackson National Life Insurance Company ("Jackson National"), a Michigan corporation, regarding a $250,000 "keyman" life insurance policy issued by Jackson National to Johnson International to cover one of the latter's key employees, Howard Warford. Warford died while on a business trip to Taiwan. Jackson National refused to pay Johnson International's claim on the keyman policy because the claim arose during the two-year contestability period for the policy, and, according to Jackson National, after Warford's death it discovered material misrepresentations in the policy application concerning Warford's health. Johnson International sued for breach of contract and negligence.[1]
 
 
 2
 The case went to trial before the Honorable Richard G. Kopf, United States District Judge for the District of Nebraska. Two issues were submitted to the jury: (1) whether there was a breach of contract by the insurer, Jackson National, in failing to pay the $250,000 face value of the policy, and (2) whether Jackson National's agent, Bill Yeager, was negligent in failing to advise Johnson International of certain risks arising out of the replacement of an earlier keyman policy issued by another company.[2] The jury returned a special verdict finding in favor of Johnson International on both claims. The district court entered judgment on the verdict for the breach of contract, but it granted Jackson National's motion for judgment as a matter of law on the negligence claim, on the ground that it was time barred. Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co., 812 F.Supp. 966 (D.Neb.1993). In addition, the court awarded plaintiff's counsel attorneys' fees, and it awarded fees and costs against the plaintiff and its counsel as sanctions stemming from certain pre-trial discovery rulings. Id. Jackson National appeals; Johnson International cross-appeals the dismissal of the negligence claim and the sanctions. We affirm in part, vacate in part, and remand.
 
 I. BACKGROUND
 
 3
 This case centers around the allegedly fraudulent insurance application of the decedent, Howard Warford. The basic facts concern a change of keyman insurance policies issued to Johnson International through insurance agent William Yeager. Yeager originally sold Johnson International a policy issued by Summit National Insurance Company ("Summit"). Approximately three months later, however, Yeager advised Johnson International that if it replaced Summit's policy with one issued by Jackson National, it could lower its premiums, because Jackson National's rates for smokers like Warford were much lower than Summit's. Johnson International agreed and made the switch.
 
 
 4
 When Warford completed the application for the Summit National policy, he answered affirmatively the question of whether he had ever been treated for "chest pain, heart murmur, high or low blood pressure, heart attack; or any disease of the heart or blood vessels?" Handwritten on the application beneath the question, it states, "chest pain" in "April, 1978," "Dr. Farex, Beatrice, Nebr." At a paramedical examination conducted as part of the Summit application process, Warford again answered affirmatively when asked if he had ever had any indication of "chest pain, palpitation, high blood pressure, rheumatic fever, heart murmur, heart attack or other disorder of the heart or blood vessels?" The words "chest pain" on the application are circled, and the handwritten detail states, "Chest pain in 1976 hospitalized Luthern [sic] Hosp. five days 1200 S. 9th, Beatrice Neb. C.T. Frerichs, M.D. 114th So. 6th Beatrice, Nebr. EKG-negative--negative findings no problems since." On the application for the Jackson National policy, however, and on the form filled out at the paramedical examination for that policy, the questions regarding chest pains and heart problems are all answered negatively.
 
 
 5
 It appears that Warford had, in fact, suffered a heart attack in 1978 and had been prescribed nitroglycerin tablets throughout the years since. He was carrying nitroglycerin tablets at the time of his death in Taiwan. The issue at trial, therefore, was whether Warford had materially misrepresented his health during the application process and intentionally deceived Jackson National. Much of the trial testimony focused on the credibility of insurance agent Yeager, who had filled out both the Summit and the Jackson National policy applications, and on what role he may have played in disregarding Warford's heart problems on the Jackson National application form. Yeager testified that he told Warford that his 1978 chest pains did not need to be reported on the Jackson National application, because they had occurred more than five years earlier. Evidence that Warford had been out of town at the time the Jackson National policy application was completed allowed an inference that Warford had not actually met with Yeager to fill out the Jackson National application and that Yeager had acted on his own--perhaps, as Johnson International suggested, with the Summit policy application to guide him.[3] Johnson International's negligence claim alleged that Yeager, as Jackson National's agent, had violated the replacement insurance regulations of the State of Washington by not providing Johnson International with proper written notice that it might lose benefits by changing the existing life insurance coverage it had for Warford.
 
 II. DISCUSSION
 A.
 
 6
 Jackson National's primary argument on appeal is that the district court erred in denying its motion for summary judgment. Jackson National states that on summary judgment, "the district court should have found as a matter of law that Warford had made material misrepresentations with a presumption of an intent to deceive or that were material to the risk or the hazard assumed by the insurer." Appellant's Br. at 29. Much of Jackson National's appellate brief is devoted to demonstrating that, based on the pretrial submissions of the parties, no genuine disputes as to material fact should have been found.
 
 
 7
 A ruling by a district court denying summary judgment is interlocutory in nature and not appealable after a full trial on the merits. Bottineau Farmers Elevator v. Woodward-Clyde Consultants, 963 F.2d 1064, 1068 n.5 (8th Cir.1992); see Reich v. ConAgra, Inc., 987 F.2d 1357, 1362 n.6 (8th Cir.1993); 15B Charles A. Wright et al., Federal Practice and Procedure Sec. 3914.28, at 210-11 & n.18 (2d ed. 1992). The final judgment from which an appeal lies is the judgment on the verdict. Bottineau, 963 F.2d at 1068 n.5. The judgment on the verdict, in turn, is based not on the pretrial filings under Federal Rule of Civil Procedure 56(c), but on the evidence adduced at trial. See id.
 
 
 8
 Summary judgment under Rule 56 is designed to eliminate prolonged litigation where, "after adequate time for discovery and upon motion, ... a party ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The primary question on summary judgment is whether there exists a genuine issue of material fact as to the elements of a party's claim. Id.; see, e.g., Wilson v. Myers, 823 F.2d 253, 256 (8th Cir.1987). Once the summary judgment motion is denied and the case proceeds to trial, however, the question of whether a party has met its burden must be answered with reference to the evidence and the record as a whole rather than by looking to the pretrial submissions alone. See Locricchio v. Legal Servs. Corp., 833 F.2d 1352, 1359 (9th Cir.1987).[4] The district court's judgment on the verdict after a full trial on the merits thus supersedes the earlier summary judgment proceedings. See id.; Bottineau, 963 F.2d at 1068 n.5. Accordingly, we find the principal issue raised and briefed by Jackson National (and the response by Johnson International) not relevant to the issues properly before us.B.
 
 
 9
 Jackson National does argue, in one and one half pages of its fifty-page appellate brief, that the jury verdict on the breach of contract claim was contrary to the evidence and the law. Its claim, however, is essentially that the trial judge should have granted it summary judgment and that the testimony presented at trial on the breach of contract claim did not present anything new. Jackson National again asks this Court to "reverse the district court's order ... rejecting the magistrate's recommendation that summary judgment be granted." Appellant's Br. at 46. We are willing to assume, based on its phrasing of the issue in its Statement of Issues Presented for Review, that Jackson National has adequately preserved a proper challenge to the district court's denial of its motion for judgment as a matter of law or a new trial. We emphasize again, however, that the record at the time of summary judgment differs significantly from that existing after trial.
 
 
 10
 Even if the content of the testimony presented at trial is the same as that of the pleadings and the affidavits presented for review at summary judgment, a jury's verdict rests on assessments of the credibility of witnesses that a cold, paper pretrial record simply will not allow. For that reason, while we review a grant of summary judgment de novo and will reverse if we find in the submissions by the parties "sufficient evidence supporting a material factual dispute to require resolution by a trier of fact," Reich, 987 F.2d at 1360, we will reverse a jury's verdict only if "the evidence is susceptible to no reasonable inferences sustaining it," Cashman v. Allied Prods. Corp., 761 F.2d 1250, 1253 (8th Cir.1985).
 
 
 11
 We find that the evidence here is sufficient to allow reasonable minds to differ about whether Johnson International is entitled to recover under the issued policy. We therefore must affirm the judgment on the jury verdict. See Latham Seed Co. v. Nickerson Am. Plant Breeders, Inc., 978 F.2d 1493, 1497 (8th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 3037, 125 L.Ed.2d 724 (1993). Under the laws of the State of Washington, it is a jury question whether Warford materially misrepresented his health on the Jackson National application, and if so, whether he had the intent to deceive that is necessary to justify denial of Johnson International's claim. See Wash.Rev.Code Sec. 48.18.090 (1984).[5] The Washington Supreme Court has held that an intent to deceive can be presumed on the basis of knowing, material misrepresentations in an insurance application, but that that presumption can be rebutted in a number of ways. See Kay v. Occidental Life Ins. Co., 28 Wash.2d 300, 183 P.2d 181, 182 (1947). If, for example, an applicant could reasonably have believed that the misrepresented health condition was cured, then the question of intent is one of fact for the jury to resolve. Id. 183 P.2d at 187 (applicant had ulcer years before and was told it was cured).
 
 
 12
 Most relevant to this appeal are three decisions of the Washington Supreme Court reflecting the tenet "that the knowledge of the agent is the knowledge of the principal, without regard to whether the agent communicates the facts to it." Fox v. Bankers Life & Casualty Co., 61 Wash.2d 636, 379 P.2d 724, 726 (1963). Pursuant to this rule, the court in Fox found that an insurance applicant's partial disclosure of a back problem to the agent rebutted the presumption of deceit and was "sufficient to put the defendant on notice that a back injury may have been involved." Id. In Olson v. Bankers Life Insurance Co., 63 Wash.2d 547, 388 P.2d 136 (1964), the applicant had told the agent the whole truth, but the agent recorded incorrect answers and assured the applicant that it did not matter. The court held that:
 
 
 13
 When an insurer's agent construes the materiality of questions in an application to the prospective insured by stating that certain information is immaterial or not required, any misrepresentations resulting therefrom are not chargeable to the applicant but to the insurer, for the reason that the agent is not the agent of the applicant but of the insurer.
 
 
 14
 Id. 388 P.2d at 138. Finally, combining aspects of these two cases, the court in Levy v. North American Co. for Life & Health Insurance, 90 Wash.2d 846, 586 P.2d 845, 849-50 (1978), held that a question of fact for the jury existed where:
 
 
 15
 There was some conflict as to what Levy revealed to the agent. The circumstances could have indicated to him that his condition [bronchial problems] was immaterial since the agent, who was familiar with the information required by North American, did not inquire further [beyond applicant's response that he suffered periodic colds and needed an atomizer to clear his bronchial tubes].
 
 
 16
 Id. The presumed intent to deceive thus appears to drop from the picture when the applicant is at least partially forthcoming about his health problems and the agent's response indicates that they are not important.
 
 
 17
 Applying these principles to the case at bar, even if we assume that insurance agent Yeager did actually meet with Warford to complete the Jackson National application (despite the evidence presented at trial that Warford was out of town that day) and if we disregard whatever information Yeager learned about Warford's health when Warford applied for the Summit policy, we find that the verdict is supported by sufficient evidence. The jury heard testimony that Warford had informed Yeager of his prior chest pains and that Yeager told Warford that the pains did not need to be reported on the Jackson National application because they had occurred more than five years earlier. After this response, when Yeager and the nurse at the paramedical examination each allegedly asked Warford whether he had suffered a heart attack or had other heart problems in the past, Warford might reasonably have believed that the inquiry was limited to the last five years and that more complete disclosure was not required.
 
 
 18
 A jury considering the evidence might note that during the Summit application process, Yeager did not mention a five-year limit, and Warford reported the chest pains and his hospitalization to both Yeager and the nurse conducting the paramedical exam. In addition, since the policy was being sought by Johnson International as a keyman policy, and not by Warford personally, a jury might strongly doubt Warford's motive to deceive.[6] Under these circumstances, a jury might reasonably conclude that, as in Fox, Olson and Levy, Warford had reported enough about his health history to put the agent, and thus Jackson National, on notice, and that Yeager, whether purposely or not, communicated to Warford that the information was not required. On this basis, the jury's implicit finding that Warford did not misrepresent his health history on the Jackson National application with the intent to deceive is supported by the evidence as it relates to the law of Washington.
 
 
 19
 Because a jury could reasonably have found that the misrepresentations in the application were not made with the intent to deceive and that Jackson National therefore breached its insurance contract with Johnson International, we affirm the district court's denial of the motion for judgment as a matter of law or a new trial on these grounds.C.
 
 
 20
 Jackson National alternatively moves for a new trial on the ground that the district court initially erred in allowing the plaintiff to amend its complaint to allege the count for negligence. Jackson National contends that the court's instructions to the jury blurred the distinctions between the claims and allowed evidence for one claim to be considered on the other. Our review of the record and the law, however, shows that the court's instructions were proper.
 
 
 21
 Jackson National objects to the court's instructions addressing the issues of agency and the imputation of knowledge. It states that had the district court properly dismissed the negligence cause of action prior to its submission to the jury, the imputation issue, and thus the question of what Yeager may have known as a result of his working on the Summit policy application, would not have been before the jury. As our analysis of the sufficiency of the evidence presented at trial indicates, however, agency and the imputation of knowledge are relevant to the contract claim as well as the claim for negligence.
 
 
 22
 Our conclusion is not altered by the fact that the court later ruled the negligence claim to be time barred. Jackson National's contention that the jury was confused by the presentation of evidence on the negligence and the breach of contract claims together is belied by the record. As the district court explained, the jury was able to distinguish between the two claims and explicitly considered them separately. We find no evidence that would lead us to conclude that the court's inclusion of the negligence claim that it later found to be time barred was anything other than harmless. Cf. Bone v. Refco, Inc., 774 F.2d 235, 243 n.10 (8th Cir.1985) (recognizing that in case with multiple claims, special verdict form "may enable an appellate court to salvage the portions of the verdict on the claims or theories properly submitted, thereby foregoing the unnecessary inconvenience, expense, and burden on the judicial system and the parties that results from having to retry the entire case").
 
 D.
 
 23
 Finally, Jackson National launches what can only be termed a frivolous attack on the district court's award of attorneys' fees to the plaintiff's counsel. Jackson National first urges that the court erred in determining that Nebraska law should apply to the attorneys' fees question. The court's application of Nebraska law was proper. Nebraska Revised Statute section 44-359 provides in pertinent part:
 
 
 24
 In all cases when the beneficiary or other person entitled thereto brings an action upon any type of insurance policy ... against any company, person, or association doing business in this state, the court, upon rendering judgment against such company, person, or association, shall allow the plaintiff a reasonable sum as an attorney's fee in addition to the amount of his or her recovery, to be taxed as part of the costs.
 
 
 25
 Neb.Rev.Stat. Sec. 44-359 (1988). In City of Carter Lake v. Aetna Casualty & Surety Co., 604 F.2d 1052, 1062 (8th Cir.1979), we held that because Nebraska regards this statute to be procedural, see Hawkeye Casualty Co. v. Stoker, 154 Neb. 466, 48 N.W.2d 623, 624 (1951), it applies to federal diversity actions in Nebraska regardless of the substantive law governing the insurance contract involved. This holding, not mentioned in Jackson National's brief, is dispositive.
 
 
 26
 Jackson National next contends that even if Nebraska law does apply, the award was erroneous because plaintiff's counsel had a contingent fee contract with the plaintiff that granted counsel a share of any recovery plus any fees granted by the court. Jackson National asserts that "the plaintiff is not the real party in interest in the request for fees." Appellant's Br. at 48. The fact that a party has a fee contract with an attorney does not affect whether that party is the real party in interest. The real party in interest is the party holding the right sought to be enforced, not necessarily the party who will ultimately benefit from recovery. Farrell Const. Co. v. Jefferson Parish, La., 896 F.2d 136, 140 (5th Cir.1990). Under Nebraska law, the beneficiary under an insurance contract has a right to attorneys' fees after judgment is rendered against an insurance company. The beneficiary, Johnson International, is thus the real party in interest in enforcing that right.
 
 III. THE CROSS-APPEAL
 A.
 
 27
 On cross-appeal, Johnson International first urges that the district court erred in granting judgment as a matter of law on the claim for negligence. In its view, the negligence claim should have related back to the time of the original complaint, and thus should not have been barred by the three-year statute of limitations. We need not address the merits of this argument, because the relief sought on the negligence claim was identical to the relief on the claim for breach of contract. Both sought the face value of the policy--$250,000. Having affirmed the court's judgment on the contract claim above, the negligence claim has now become moot. See, e.g., Hal Roach Studios v. Richard Feiner & Co., 896 F.2d 1542, 1556 n.24 (9th Cir.1990); Consolidated Rail Corp. v. Fore River Ry., 861 F.2d 322, 326 (1st Cir.1988).
 
 B.
 
 28
 Johnson International and its counsel, Cassem, Tierney, Adams, Gotch & Douglas ("Cassem"), together raise the other main claim in the cross-appeal, urging that the court erred in entering sanctions against them of $7,742.20 in expenses and attorneys' fees for their failure to admit certain items proved at trial. Cassem challenges the court's application of Federal Rules of Civil Procedure 36(a) and 37(c) to order the sanctions. It contends that these rules allow sanctions only against parties, not counsel.[7]
 
 
 29
 Regardless of the possible strength of Cassem's argument,[8] we may affirm the district court's judgment and its imposition of sanctions on any basis supported by the record. See Monterey Dev. Corp. v. Lawyers' Title Ins. Co., 4 F.3d 605, 608 (8th Cir.1993) (judgment); Apex Oil, 855 F.2d at 1014 (sanctions). Our review of the record shows that sanctions were appropriate under Rule 26(g), see id., and that the order against Cassem was not an abuse of the district court's discretion,[9] see Harlan v. Lewis, 982 F.2d 1255, 1259 (8th Cir.) (observing that "[w]e review all aspects of the imposition of sanctions under an abuse of discretion standard") (citing Chambers v. NASCO, Inc., 501 U.S. 32, ----, 111 S.Ct. 2123, 2138, 115 L.Ed.2d 27 (1991)), cert. denied, --- U.S. ----, 114 S.Ct. 94, 126 L.Ed.2d 61 (1993). By failing to admit such basic facts as Warford's 1978 heart problems, of which they had full knowledge prior to trial, Cassem and Johnson International clearly added unnecessary delay and expense to the litigation.
 
 
 30
 Cassem and Johnson International also contest certain amounts and expenses included by the court in the sanctions award. While a district court has broad discretion to fashion a reasonable sanction, In re Stauffer Seeds, Inc., 817 F.2d 47, 49 (8th Cir.1987), we believe a remand is warranted here to consider one aspect of the cross-appellants' claim. In ordering the sanctions, the court relied on an affidavit of fees and expenses submitted by Jackson National.[10] The court disallowed certain expenses associated with witnesses Robert Felker, Jonathan Noll, and Andrew Branchesi, as well as those relating to interpreter Kate King. Cassem and Johnson International apparently contend that not all of the expenses relating to these individuals were deducted from the court's sanction. If true, we believe the award should be corrected to be brought into line with the court's order. We thus vacate the amount of the sanctions award and remand for reconsideration of this question.
 
 IV. CONCLUSION
 
 31
 The judgment on the verdict finding Jackson National liable for breach of its insurance contract with Johnson International is affirmed, as is the court's award of attorneys' fees to Johnson International. The court's order of sanctions against Johnson International and its counsel is also affirmed. The case is remanded, however, for reconsideration of the amount of the sanctions award.
 
 
 
 *
 The HONORABLE ANDREW W. BOGUE, Senior United States District Judge for the District of South Dakota, sitting by designation
 
 
 [1]
 The parties agree that Washington law governs the substantive issues
 
 
 [2]
 The negligence claim had not been included in the original complaint. The district court allowed Johnson International to amend its complaint to add the negligence claim shortly before trial, exercising its authority under Federal Rules of Civil Procedure 15(a) and 16(e). After trial, the court held that the amendment would not relate back in time to the filing of the original complaint, and that therefore, the three-year statute of limitations period for the negligence claim had expired
 
 
 [3]
 At trial, Yeager testified that when he fills out an insurance application for somebody who recently acquired insurance through him with another company he routinely "may look" at the earlier application. He was emphatic, however, that he would "never" refer to the prior application to get information
 
 
 [4]
 The court in Locricchio explained:
 To be sure, the party moving for summary judgment suffers an injustice if his motion is improperly denied. This is true even if the jury decides in his favor. The injustice arguably is greater when the verdict goes against him. However, we believe it would be even more unjust to deprive a party of a jury verdict after the evidence was fully presented, on the basis of an appellate court's review of whether the pleadings and affidavits at the time of the summary judgment motion demonstrated the need for a trial. After considerable research, we have found no case in which a jury verdict was overturned because summary judgment had been improperly denied.
 833 F.2d at 1359.
 
 
 [5]
 The relevant provision of Washington law states:
 (1) Except as provided in subsection (2) of this section, no oral or written misrepresentation or warranty made in the negotiation of an insurance contract, by the insured or in his behalf, shall be deemed material or defeat or avoid the contract or prevent it attaching, unless the misrepresentation or warranty is made with the intent to deceive.
 (2) In any application for life or disability insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any such statement shall not bar the right to recovery under the contract unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer.
 Wash.Rev.Code Sec. 48.18.090 (1984).
 
 
 [6]
 The jury also had before it Yeager's curious claim that his file on Warford had mysteriously disappeared prior to trial because he gave it to an unknown and unidentified lawyer who never returned it. Added to the conflict in the evidence over whether Yeager could have met with Warford on the date he said he did to fill out the Jackson National application, and Yeager's own financial motive to complete the sale of the policy, the jury might reasonably have concluded that Yeager's credibility overall was questionable
 
 
 [7]
 We assume that Cassem alone is making this argument, since if we were to agree that sanctions could not be awarded against counsel, the full burden of the court's order would fall on Johnson International. As a party, Johnson International is clearly within the scope of Rule 37(c)
 
 
 [8]
 Rule 37(c) authorizes sanctions against "a party [who] fails to admit the genuineness of any document or the truth of any matter as requested under Rule 36," if the truth of that matter is later proved and none of rule's exceptions apply. Some courts and commentators have concluded that by its terms, Rule 37(c) thus does apply only to a party, and not its counsel, as Cassem suggests. See Apex Oil Co. v. Belcher Co. of New York, 855 F.2d 1009, 1014 (2d Cir.1988); 4A James W. Moore et al., Moore's Federal Practice p 37.04, at 37-116 (2d ed. 1993)
 
 
 [9]
 In particular, we see support for the district court's finding that it was "inexplicable," 812 F.Supp. at 987, that Johnson International and its counsel refused to admit that Warford died in Taiwan of an acute myocardial infarction, even though when Johnson International made the insurance claim, it had asserted this fact as true. The record shows that Johnson International had been provided copies of Warford's medical records from the hospital in Taiwan, written in both Chinese and English, and that there existed easy access by telephone to the doctors who had treated Warford. Nevertheless, Johnson International and its counsel still refused to admit that the doctors in Taiwan would testify that Warford died of an acute myocardial infarction
 The record also supports the court's finding that Johnson International and its counsel's refusal to admit that Warford had suffered and been treated for a myocardial infarction in 1978 was "not justified," id. at 988. The record is clear that prior to the suit, Johnson International or one of its lawyers had a copy of Warford's medical records from the Nebraska hospital where he had been treated. Indeed, in a letter to Jackson National prior to the suit, Johnson International's counsel explicitly stated that it did "not deny that Mr. Warford had experienced heart problems which where not disclosed in the [policy] application."
 Finally, the record supports the court's imposition of sanctions for Johnson International and Cassem's refusal to admit to Warford's prescription history. The record shows that Johnson International had a copy of Warford's prescription history prior to the suit, and it knew that at the time of Warford's death, Warford was carrying a prescription for nitroglycerine tablets issued by Dr. Frerichs of Beatrice, Nebraska. We agree with the district court that if Johnson International had had any doubts about the prescription history, it could have easily confirmed its authenticity by telephoning the pharmacist at the drugstore where the prescriptions were filled or the retired pharmacist who had owned the store previously. Ultimately, Johnson International could have qualified its answers, as provided in Rule 36(a), and admitted only part of what was requested and denied the rest.
 
 
 [10]
 The court also determined that fees under Rule 37(a)(4) should be awarded for prosecuting the motion for sanctions. Such an award is consistent with the purposes of sanctions under Rules 37 and 26(g)--to deter abuse and compensate the opposing party for " 'all expenses, whenever incurred, that would not have been sustained had the opponent conducted itself properly,' " In re Stauffer Seeds, 817 F.2d at 50 (citation omitted); see also Fed.R.Civ.Pro. 26(g) advisory committee's note (1983 amendment)